J. A16045/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  A.J.K., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  S.K., MOTHER | : | |
| | : | No. 3534 EDA 2017 |

Appeal from the Decree, October 4, 2017,
in the Court of Common Pleas of Philadelphia County
Family Court Division at No. CP-51-AP-0000913-2017

BEFORE:  BENDER, P.J.E., LAZARUS, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED AUGUST 03, 2018**

S.K. ("Mother") appeals from the October 4, 2017 decree entered in the Court of Common Pleas of Philadelphia County, Family Court Division, involuntarily terminating her parental rights to her dependent child, A.J.K., male child, born in October of 2015 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).[1]  Mother's counsel, Michael J. Graves, Jr., Esq. ("Attorney Graves"), has filed a petition for leave to withdraw as counsel and an **Anders**[2] brief.  After careful review, we affirm the decree and grant Attorney Graves leave to withdraw.

---

[1] In a separate decree entered on October 4, 2017, the trial court terminated the parental rights of A.J.K.'s father, D.L.K. ("Father"), also pursuant to Sections 2511(a)(1)(2), (5), (8), and (b).  Father filed an appeal at Superior Court Docket No. 3536 EDA 2017, and on June 11, 2018, a panel of this court affirmed the decree terminating Father's parental rights to A.J.K.

[2] **See Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).

The record reflects that Child has two siblings, Z.L.K., born in June 2001, and C.K., who was "about 20 years old" in 2015. (Notes of testimony, 10/4/17 at 13.) On March 9, 2015, the Department of Human Services ("DHS") received a general protective services report alleging that Z.L.K. was truant, that Z.L.K.'s school had attempted to contact Mother and Father, that Z.L.K. was two school grades below her grade level, and that concerns existed regarding the condition of the family home. (*Id.* at 10-11.) DHS attempted to visit the home approximately four times, but Mother and Father failed to respond. (*Id.* at 11.) After obtaining a break-in order, and with police assistance, DHS entered the home on April 27, 2015. (*Id.* at 11-12.) Once inside the home, DHS discovered that it was in deplorable condition. There was trash, including empty soda bottles, pizza boxes, broken toys, and dog waste, from the door all the way to the top of the top floor. (*Id.* at 12-13.) The home reeked of the "stench of dog, dog urine, feces, old food, [and] garbage." (*Id.* at 19-20.) The bathtub was filled with trash. (*Id.* at 21.) The children's beds did not have bedsheets, the refrigerator was empty, and the stove was inoperable. (*Id.* at 13.) The garage was filled with car parts from floor to ceiling. (*Id.* at 12.)

DHS met with Child and Z.L.K., both of whom were not well kept. (***Id.*** at 14, 20.)[3] Z.L.K. informed DHS that she had not had her hair done in a year or two and did not know the last time she had taken a bath. (***Id.*** at 20-21.) DHS noted that Child had bruising on various parts of his body. (***Id.*** at 14.) Additionally, Child had not received well-child visits or immunizations for two to three years. (***Id.*** at 19.)

DHS obtained an order for protective custody. The trial court adjudicated Child dependent on May 19, 2015. Shortly after being removed from the home, Child was placed with S.T. ("Foster Mother").

The trial court held numerous permanency review hearings following Child's placement. Mother's goals varied, but included visiting Child, cleaning the home of debris and other items that posed a safety threat to Child, obtaining permanent housing, completing parenting classes, and continuing individual therapy. On September 18, 2017, DHS filed a petition for

---

[3] DHS may have been able to speak with Child and Z.L.K. prior to April 28, 2015. (***See*** trial court opinion, 1/24/18 at 4-5 (stating that on April 14, 2015, Father answered the door and, although he did not allow DHS to enter the home, DHS did speak with the children); petition for involuntary termination of parental rights, 9/18/17 at Ex. A., statement of facts, ¶ h (same).) The facts set forth in this memorandum are gleaned from the petition for involuntary termination of parental rights hearing transcript.

involuntary termination of parental rights to Child.[4]  On October 4, 2017, the trial court conducted a hearing.[5]

At the hearing, George Siti, a DHS social worker, outlined the case's history prior to adjudication.  (*Id.* at 9-26.)  Additionally, Dr. Erica Williams, psychologist and director of forensic services at Forensic Mental Health Services, testified.  Dr. Williams testified that her colleague, Dr. William Russell, performed the initial parenting capacity evaluation on Mother and that she performed the follow-up parenting capacity evaluation on Mother and a bonding evaluation with Mother, Father, and Child.  (*Id.* at 27.)  The ultimate conclusion of the December 2015 initial parenting evaluation of Mother was that Mother did not present with the capacity to provide safety and permanency to Child.  (*Id.* at 33.)  Particular concerns included Mother's chronic neglect of Child, Mother's failure to meet Child's needs, and Mother's inability or unwillingness to identify the role she played in order to minimize those concerns.  (*Id.* at 33.)  Following a March 2017 parenting capacity evaluation, Dr. Williams concluded that Mother did not present with the capacity to provide safety and permanency to Child.  (*Id.* at 36.)  Dr. Williams

---

[4] DHS also filed a petition to terminate Father's parental rights to Child, and the trial court terminated Father's parental rights to Child on the same day it terminated Mother's rights.

[5] The trial court set forth a comprehensive factual history of this case, together with an extensive summary of the evidence presented at the hearing.  (*See* trial court opinion, 1/24/18 at 1-33.)

noted that Mother "is a passive participant in her children's lives and the neglect that occurred to them." (*Id.* at 39.)

Dr. Williams also conducted a bonding evaluation. (*Id.* at 40.) She noted that Child had no interest in engaging with Mother and that Child referred to Mother by her first name. (*Id.* at 41-42.) Dr. Williams further noted that during the evaluation, Child became the adult in the room. (*Id.* at 43.) Child then opted to end the visit. When Mother called to him, Child ignored Mother. When Mother asked for a hug and kiss goodbye, Child said "no." When Mother tried to hug Child, he ducked and left. Dr. Williams opined that Child would not suffer irreparable harm if the trial court terminated Mother's parental rights. (*Id.* at 44.)

Reginald Nelson, the case manager at Catholic Community Services, a Community Umbrella Agency, also testified. Mr. Nelson stated that issues existed in the current home, including DHS's observation of drug paraphernalia in the home and its concerns regarding the individuals living in the current home, clutter in the home, and sleeping arrangements. (*Id.* at 75-76.) Mr. Nelson further testified that Child did not want to attend parental visitations and resisted visitations by being non-cooperative and hiding. (*Id.* at 81-82.) Mr. Nelson stated that when he first met Child, Child had bruising and sores on his body and a cockroach was pulled out of his right ear. (*Id.* at 83.) Mr. Nelson testified that Child's interactions with Foster Mother are "very positive[,]" there "seems to be a strong bond there with

[Foster Mother,]" and Child seems "very secure" with Foster Mother. (*Id.* at 85.) He opined that Child would not suffer irreparable harm if Mother's parental rights were terminated. (*Id.*) Mr. Nelson further stated that Mother does not call him to inquire about Child's well-being. (*Id.* at 86.) He further noted that Child alleged that before being removed from Father and Mother's home, he had been "locked in the trunk of a vehicle and locked in a room for a period of time." (*Id.* at 86.) Mr. Nelson stated that Child refers to his foster parents as mom and dad. (*Id.* at 105.) He opined that termination of Mother's parental rights would be in Child's best interests. (*Id.*)

Dr. Beverly Ingles, a psychologist, also testified. She sees Child in therapy on a bi-weekly basis. (*Id.* at 108.) Dr. Ingles stated that Child is very responsive to Foster Mother and is very well bonded with her. (*Id.* at 114.) She has observed that Child's visits with his parents are very difficult for Child. Child has nightmares after the visits and states that he does not like his parents because they are "bad." (*Id.* at 114-115.) She further testified that Child refers to Father and Mother by their first names and refers to his foster parents as mom and dad. (*Id.* at 115.) Dr. Ingles opined that removing Child from the foster home would be harmful and produce "devastating effects." (*Id.* at 117.)

Foster Mother testified that when Child arrived in her home, he was "sad, frightened and confused." (*Id.* at 122.) She stated that Child was clingy, had nightmares, and asked her to stay by his bed at night. (*Id.*) She

further stated that Child is much better now, that her relationship with Child is excellent, and that Child goes to her and her husband with his fears and anxieties. (*Id.* at 124.)

Mother testified that Child permitted Mother to hug him during visits, but after eight or nine months, Child "seemed to get more angry, frustrated." (*Id.* at 166-167.) Mother stated that she completed parenting classes and received a perfect attendance certificate. (*Id.* at 170-171.) She further testified that she was receiving behavioral health treatment. (*Id.* at 171-172.) Mother stated that she now spends a lot of time "scrubbing floors." (*Id.* at 174.) She claimed that she was putting money aside and "looking into a VA loan so that [she and Father] can buy a house outright[,]" but that at the time she and Father "checked into it[, the VA] said [Father] wasn't eligible for any benefits." (*Id.* at 174-175.) Mother further testified that she believes that the reason Child was removed from the family home was because she was "selfish" and "got bogged down by grief" over her father's death in November 2015. (*Id.* at 177-178.) She further testified that she did not provide Child with needed medical services prior to removal because the family "didn't have medical insurance at the time." (*Id.* at 177-178.)

Following the close of testimony, the trial court involuntarily terminated Mother's parental rights to Child, finding that DHS presented clear and convincing evidence for termination of Mother's maternal rights under

Sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act and that termination would be in Child's best interest.

On October 30, 2017, Mother filed a notice of appeal and a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Subsequently, the trial court filed its Rule 1925(a) opinion. Mother's counsel then filed a petition for leave to withdraw as counsel and an **Anders** brief.

Pursuant to **Anders**, when counsel believes an appeal is frivolous and wishes to withdraw from representation, he or she must do the following:

(1) petition the court for leave to withdraw stating that after making a conscientious examination of the record . . . , counsel has determined the appeal would be frivolous;

(2) file a brief referring to anything that might arguably support the appeal . . . ; and

(3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed **pro se**, or raise any additional points he deems worthy of the court's attention.

**In re S.M.B.**, 856 A.2d 1235, 1237 (Pa.Super. 2004) (citation omitted).[6]

In **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009), our supreme court addressed the second requirement of **Anders**, **i.e.**, the contents of an **Anders** brief, and required that the brief:

---

[6] In **In re V.E.**, 611 A.2d 1267, 1274-1275 (Pa.Super. 1992), this court extended the **Anders** principles to appeals involving the termination of parental rights. "When considering an **Anders** brief, this Court may not review the merits of the underlying issues until we address counsel's request to withdraw." **In re S.M.B.**, 856 A.2d at 1237.

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361. "After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d at 1237.

Attorney Graves has substantially complied with each of the requirements of *Anders*. Although Attorney Graves does not directly state in his petition that after making a conscientious examination of the record he has determined that the appeal is frivolous, he states he is filing an *Anders* brief and references *Santiago*. Further, in the *Anders* brief, which counsel forwarded to Mother, along with the petition, counsel directly states that he has made a conscientious examination of the record and determined the appeal is frivolous. (*Anders* brief at 15.) Further, Attorney Graves's *Anders* brief comports with the requirements set forth by the Supreme Court of Pennsylvania in *Santiago*. Finally, attached to Attorney Graves's petition for

leave to withdraw is a copy of his April 11, 2018 letter to Mother advising Mother of her right to proceed ***pro se*** or retain alternate counsel and stating Attorney Graves's intention to seek permission to withdraw. We note that the record reveals that Mother filed no response. Accordingly, Attorney Graves has substantially complied with the procedural requirements for withdrawing from representation, and we will proceed with our own independent review.

In the ***Anders*** brief, Attorney Graves raises the following issue: "Whether there was a legal basis for terminating Mother's parental rights pursuant to 23 Pa.C.S.A. [§§] 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b) to change goal from reunification to adoption." (***Anders*** brief at 6 (full capitalization omitted).)

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be

> terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).  "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . .  [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of

services, may properly be rejected as untimely or disingenuous." ***In re A.L.D***., 797 A.2d at 340 (internal quotation marks and citations omitted).

Here, in terminating Mother's parental rights, the trial court noted that when DHS removed Child from the home, the home was uninhabitable due to the "collection of junk and trash," the children were unkempt, Z.L.K. had not been attending school, and the children had not received medical care. (Notes of testimony, 10/4/18 at 184.) Although the trial court acknowledged that Mother had attended parenting classes, it emphasized that after 30 months of doing so, Mother was still unable to recognize the issues that resulted in Child's removal from the home and that Mother had failed to demonstrate that she benefited from parenting classes and was able to parent, keep Child safe, and provide for Child's well-being going forward. (***Id.*** at 185-188.)

The trial court further noted that Mother and Father's current home became appropriate only within the few weeks preceding the hearing because they "moved into another building rather than address the mess that they had created" in the previous home. (***Id.*** at 186-187.) The trial court found that Mother and Father failed to take any concrete steps to put themselves in a position to parent Child. (***Id.*** at 187.) Additionally, the trial court noted that "[f]rom the beginning when [C]hild was placed he became a different child." (***Id.***) It referenced the experts' opinions that therapy and education have not improved Mother's status as a parent and noted that Mother is "unconnected

to reality and that's a safety factor for this [C]hild going forward." (*Id.* at 189-190.) The trial court concluded that the record is clear and convincing that Mother is not able to parent Child. (*Id.* at 188; *see also* trial court opinion, 1/24/18 at 36-39.)

We conclude that the record supports the trial court's factual findings and that the trial court did not abuse its discretion in terminating Mother's parental rights under Section 2511(a)(2). The record demonstrates that the conditions that existed upon removal establish repeated and continued incapacity, abuse, neglect, or refusal of Mother that caused Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. The record also supports the trial court's conclusion that Mother continued to lack capacity to parent Child.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below,

- 15 -

> evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in

a pre-adoptive home and whether they have a bond with their foster parents."

***T.S.M.***, 73 A.3d at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***Id.*** at 269. The ***T.S.M.*** court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

In determining that termination of Mother's parental rights favored Child's needs and welfare, the trial court noted Mr. Nelson's testimony that Child did not ask for Mother; referred to his parents by their first names; referred to his foster parents as mom and dad; and seeks his foster parents for safety, comfort, and to meet his daily needs. (Trial court opinion, 1/24/18 at 40.) It further noted that Dr. Ingles testified that Child is well bonded to Foster Mother and that Child did not want to visit his parents. (***Id.***) It also referenced the bonding evaluation, which concluded that Child would not suffer irreparable harm if the trial court terminated Mother's parental rights. (***Id.***) The trial court found that termination would best serve Child's needs and welfare and that Child would not suffer irreparable harm if Mother's parental rights were terminated. (***Id.*** at 40-41.) Our review of the record supports this determination, and the trial court did not abuse its discretion in terminating Mother's parental rights.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under Sections 2511(a)(1), (2), (5), (8), and (b). Moreover, after a thorough review of the **Anders** brief,[7] the pertinent law, and our independent examination of the certified record, we conclude that the appeal is frivolous and unsupported in law or in fact.

Decree affirmed. Petition of Attorney Graves for leave to withdraw as counsel granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/3/18

---

[7] We note that by correspondence to dated May 1, 2018, DHS informed this court that it elected against filing an appellee's brief in this matter as a result of the **Anders** brief filed by Attorney Graves.